[Cite as *Bishop v. Ohio State Univ. Wexner Med. Ctr.*, 2020-Ohio-3483.]

| | |
|---|---|
| MINTHA BISHOP | Case No. 2017-00830JD |
| Plaintiff | Magistrate Anderson M. Renick |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| THE OHIO STATE UNIVERSITY WEXNER MEDICAL CENTER | |
| Defendant | |

{¶1} Plaintiff brought this action alleging both ordinary negligence and medical negligence. The case proceeded to trial on the issues of liability and damages. Plaintiff's claims arise from a fall that plaintiff suffered while she was a patient at defendant Ohio State University Wexner Medical Center (OSUWMC). Plaintiff had a history of end stage renal disease and was admitted to OSUWMC on October 9, 2016, due to a problem with her hemodialysis catheter. At the time of her admission and throughout her hospitalization, plaintiff was designated as a high fall risk. On October 12 at approximately 5:00 a.m., plaintiff exited her hospital bed, took a few steps, and then fell.[1]

{¶2} After the fall, Patient Care Assistant Kourtny Hanes found plaintiff on the floor and called for help. Several nurses assisted plaintiff back into her hospital bed and began to assess her. At that time, plaintiff was alert and oriented "times two," meaning that she was oriented as to two out of four criteria; person, place, time, and situation. Dr. Linda Vong, a hospitalist, was paged and during her subsequent examination, she found that plaintiff was alert and oriented as to all four criteria. Dr. Vong ordered x-rays to further assess the extent of plaintiff's injuries. She also directed a nurse to activate a bed alarm and raise the bed rails.

---

[1]All references to October in this decision are to October 2016.

{¶3} As a result of the fall, plaintiff suffered bruising and swelling to her face, a laceration on her chin, and fractures to her left maxilla and right mandibular condylar head. Her injuries were treated throughout the rest of her hospital stay, and a follow-up appointment was scheduled. Plaintiff was discharged from OSUWMC on October 15.

{¶4} Plaintiff alleges that defendant's nursing staff was negligent for failing to utilize a bed exit alarm. Plaintiff further alleges that OSUWMC medical staff failed to follow defendant's own policies and take additional fall prevention precautions, such as moving plaintiff closer to the nurses' station, raising all the side rails on her bed, and placing a call light within her reach.

{¶5} Plaintiff testified that defendant's nurses neither discussed using a bed exit alarm with her nor installed an alarm during her October 2016 hospitalization. She stated that if the nurses had offered her a bed alarm, she would have agreed to have it placed on the bed. Plaintiff further testified that she woke up in the early morning of October 12 and wanted to go to the bathroom. However, she was alone in her room and she could not find her call light. Plaintiff testified that she "looked down, and the rails were down on the right side." Plaintiff decided to get out of the bed and go to the bathroom without assistance, whereupon she took a couple steps and fell. (Tr, 31:13-16.) Plaintiff asserted that she would not have been able to exit the bed if the side rails had been up.

{¶6} Plaintiff also testified that she was scared and injured by the fall, including a broken jaw and cheekbone. As a result of the fall, plaintiff's dentures did not fit properly and caused her discomfort while eating.

{¶7} During cross-examination, plaintiff acknowledged that she was fully awake when she got out of her hospital bed. She admitted that she was not confused and she was aware of what she was doing. She testified that one of the reasons she decided to get out of bed was because she wanted to get up and show people that she could walk. Plaintiff admitted that she was not certain how many bed rails were on the bed, but she

believed there was only one rail on each side. When counsel informed her that the bed had two rails on each side and asked if both of the rails were down on the right side she responded affirmatively.

{¶8} Theresa Clipper, plaintiff's daughter, testified that when plaintiff was previously hospitalized in the same facility in September 2016, a bed alarm was utilized and the side rails were placed up. According to Clipper, the alarm sounded when plaintiff moved and the care team responded immediately. Clipper related that when she visited her mother in the hospital on October 11, the day before plaintiff's fall, the rails on her bed were down, there was no bed alarm, and the call light was not within plaintiff's reach. Clipper related that she notified an aide that the bed rail was not up and he subsequently raised it. Clipper testified that neither she nor her mother were asked if they wanted a bed alarm, and that they would have accepted a bed alarm if one had been offered.

{¶9} On October 12, at approximately 1:00 p.m., Clipper received a call regarding the fall. When she arrived at the hospital, she learned that her mother's "jaws were broken and her cheek was broken, and she was bruised clear down through her ribs." (Tr, 69:22-24.) Clipper testified that after the fall, the care team utilized a bed alarm, raised the bed rails, and put plaintiff in a "lower bed." (Tr, 74:20-22.) According to Clipper, the charge nurse informed her that the bed rails were down at the time of the fall. During cross-examination, Clipper admitted that she believed that there was only one rail on each side of the bed, and she could not remember whether two or four rails were lowered on October 11. Clipper admitted that plaintiff told her that she was neither confused nor groggy when she got out of bed, but Clipper clarified that her mother "always says she's not confused." (Tr, 81:19-20.)

{¶10} Patient Care Assistant Kourtney Hanes, who found plaintiff after she fell, testified via deposition that she saw plaintiff in bed approximately 30 minutes before the incident. During that rounding visit, she checked the position of the bed rails and

ensured that the call light was in her bed next to her. When Hanes returned to the room she observed plaintiff on the floor, and she heard plaintiff ask for help and apologize for getting out of bed. Hanes observed that three bed rails were up; the bed rail on the side of the bed facing the bathroom was down. Hanes called for help and two other patient care assistants responded and then called nurses. Hanes left the room and then later returned after plaintiff had been cleaned up. Hanes testified that plaintiff repeatedly apologized to her. According to Hanes, plaintiff stated that she got out of bed because she had to go to the bathroom and she did not want to bother Hanes, who had just been in the room.

{¶11} Nurses Megan Huffman (fka Megan Webster) and Kimberly Molter (fka Kimberly Crawford) cared for plaintiff during the time in question. Nurse Molter was in training at the time and she worked under the supervision of Nurse Huffman. Nurse Huffman testified that OSUWMC's hospital beds have two rails on each side. She explained that it was standard nursing practice for every hospital bed at OSUWMC to have three of the side rails up. According to Nurse Huffman, a bed that had all four side rails up was considered a restraint. She further testified that an alert and oriented patient had the right to refuse a bed exit alarm, in which case a nurse was not permitted to place an alarm on the bed. Both Nurse Huffman and Nurse Molter testified that OSUWMC policy does not require the use of every fall precaution, including a bed exit alarm, on a high fall risk/high injury risk patient. Instead, a nurse must assess which precautions are appropriate for each individual patient.

{¶12} Nurse Huffman testified that when she performed her assessment of plaintiff at the beginning of her shift during which the fall occurred plaintiff was alert and oriented "times four." She testified that she offered plaintiff a bed exit alarm, but plaintiff refused the alarm. However, Nurse Huffman did not document the refusal. She further testified that plaintiff and her family told her that plaintiff would not need to get out of bed

to go to the bathroom because plaintiff had an ostomy bag.  Nurse Huffman testified that plaintiff had used her call light prior to the fall.

{¶13}  Nurse Huffman testified that after plaintiff had been assessed as a high fall risk, universal fall precautions were implemented, including: three bed rails were raised, the bed was in the lowest position, and the call light was within plaintiff's reach.  She further testified that she placed the bottom bed rail down on the side of bed that is closest to the bathroom.  She also related that it was her regular practice to tie the call light cord to the top of the bed rail so that the call light would remain within the patient's reach.  When she performed her hourly rounding, Nurse Huffman checked the position of the bed, the bed rails, and the call light.  She explained that the charge nurses, the patient care assistant, and the nurse whom she was training also performed rounds. Nurse Huffman testified that plaintiff could use her call light to obtain help if she needed to get out of bed between rounding visits.

{¶14}  Nurse Huffman did not witness plaintiff fall.  At that time, both she and Nurse Molter were on their coffee break.  Nurse Huffman testified that she ran to plaintiff's room after she received the call informing her that plaintiff fell in her room. When she arrived, the bed was raised, the side rails were down, and medical staff were at the bedside.  Nurse Huffman explained that during an emergency, it was standard practice to lower side rails to access the patient and prepare for the possibility of resuscitation.  After plaintiff's fall, x-rays and pain medication were ordered, and Nurse Huffman placed a bed exit alarm.  Nurse Huffman testified that she walked plaintiff "down to CT" after the incident, at which time plaintiff asked her to call her daughter and she stated that she was sorry that she got out of bed without assistance.

{¶15}  During cross-examination, Nurse Huffman admitted that she had charted that plaintiff was forgetful.  She further admitted that she had offered plaintiff a bed exit alarm because she was a high fall risk and high injury risk.  She testified that according to OSUWMC policy, a decision regarding whether a bed exit alarm is appropriate is

made following an assessment of the patient. She reiterated that the various fall precautions addressed in the policy are discretionary and implemented based upon a medical assessment and not necessarily mandated by the policy. Nurse Huffman also admitted that she should have documented plaintiff's refusal of the bed exit alarm in plaintiff's chart. However, she testified that she discussed the risks and benefits of the bed exit alarm with both plaintiff and her daughter.

{¶16} Nurse Kimberly Molter testified that she began her shift on October 11, at 11:00 p.m. and she worked until 7 a.m. on October 12. She assessed plaintiff to be alert and oriented "times four." Nurse Molter testified that universal fall precautions were in place for plaintiff: three side rails were raised, the bed was in low position, the bed wheels were locked, and the call light was within plaintiff's reach.

{¶17} Nurse Molter assessed plaintiff at 12:55 a.m., 2:55 a.m., and 4:09 a.m. She testified that when she left plaintiff's room at 4:10 a.m., the bed was in the low position, three side rails were raised, and the call light was within reach. She also corroborated Nurse Huffman's testimony, that the call light cord was wrapped around a bed rail to prevent it from falling out of reach. She testified that plaintiff should have called a nurse for assistance via her call light or via the room phone on the bedside tray.

{¶18} At the time of the fall, Nurse Molter was on another floor getting coffee with Nurse Huffman. Nurse Molter testified that they both immediately returned to the room when they learned of the fall. By the time they arrived, there was a group of medical staff around plaintiff. Nurse Molter did not remember whether she helped plaintiff back into her bed. During cross-examination, Nurse Molter admitted that she did not document any additional fall precautions that were implemented after plaintiff's fall.

{¶19} Dr. Linda Vong, the doctor who responded when plaintiff fell, testified via deposition. Dr. Vong testified that she did not recall treating plaintiff; however, she

identified her notes which were recorded in plaintiff's medical record. Dr. Vong's note from the encounter reads, in part:

> Paged by nurse, Pt had a fall. Medical staff found her near doorway, bleeding on chin.
>
> Bed alarm and rails were not being utilized.
> I came to assess Pt.
> C/o pain to left face and left shoulder.

(Defendant's Ex. A, p. 1939.)

{¶20} Dr. Vong explained that it was her "habit" to first document information she obtained after being paged by a nurse. According to Dr. Vong, she then skipped a line in her notes to distinguish "all the information I've gathered after I've gone to see the patient." (Vong Deposition, 10:23-11:6.) Based upon her notes, Dr. Vong testified that she was certain that her notation that "[b]ed alarm and rails were not being utilized" reflects that that equipment was not being utilized when she first entered the room.

{¶21} Dr. Vong also testified that her notes show that plaintiff was back in the hospital bed by the time she arrived. Dr. Vong explained that, generally, a patient is in bed when she performs an examination. If the patient was not in bed, she would note the location of the patient. Dr. Vong examined plaintiff and found her alert and oriented "times four." Dr. Vong ordered x-rays to further assess the extent of plaintiff's injuries. She also directed a nurse to turn on a bed alarm and raise the bed rails.

{¶22} During cross-examination, Dr. Vong testified that during a day shift, she performed rounds and checked on her patients. But during a night shift, she responded to pages from nurses and visited new admissions. Dr. Vong explained that when she answered a page, she prioritized what was important at that moment. She further testified that there was no typical page during a night shift.

{¶23} In her complaint, plaintiff alleges both ordinary negligence and medical negligence, including nursing negligence. To the extent that plaintiff brings an ordinary

negligence claim, plaintiff must prove:  "(1) the existence of a legal duty, (2) the defendant's breach of that duty, and (3) injury that is the proximate cause of the defendant's breach."  *Wallace v. Ohio Dept. of Commerce, Div. of State Fire Marshall*, 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018, ¶ 22.

{¶24} "In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things."  *Bruni v. Tatsumi,* 46 Ohio St.2d 127, 346 N.E.2d 673 (1976), paragraph one of the syllabus.

{¶25} The same standard applies equally to claims that a nurse negligently caused injury to a patient.  *Ramage v. Central Ohio Emergency Serv., Inc.*, 64 Ohio St.3d 97, 1992-Ohio-109, 592 N.E.2d 828 (1992), paragraph one of the syllabus. "Because nurses are persons of superior knowledge and skill, nurses must employ that degree of care and skill that a nurse practitioner of ordinary care, skill and diligence should employ in like circumstances.  Whether a nurse has satisfied or breached the duty of care owed to the patient is determined by the applicable standard of conduct, which is proved by expert testimony."  *Berdyck v. Shinde*, 66 Ohio St.3d 573, 1993-Ohio-183, 613 N.E.2d 1014, (1993), paragraph three of the syllabus.

{¶26}  Nurse Christine Reid, RN, plaintiff's nursing expert, testified that she has a critical care certification and has been a registered nurse since 1981.  Nurse Reid has experience in onboarding new nurses and was previously involved in developing or revising several policies, but she has not developed any policies on fall prevention.

{¶27} Nurse Reid testified that a bed exit alarm prevents falls by alerting the patient that she should not get out of bed unassisted. The alarm also alerts medical staff to respond immediately. She further testified that side rails help prevent falls by assisting in mobility, and acting as both a safety net and a visual cue. Nurse Reid explained that, generally, three rails are placed in the up position, with the lower rail placed down on the side facing the bathroom. She testified that a bed with four rails in the up position is considered a restraint because the rails restrict a patient's movement. However, four rails may be placed in the up position, and not considered a restraint, when the patient is in a stretcher, sedated, recovering from anesthesia, or subject to seizure precautions.

{¶28} Nurse Reid testified that when plaintiff was previously admitted to OSUWMC in September 2016, she was assessed as a high fall and high injury risk and bed alarms were utilized throughout that entire admission. According to Nurse Reid's review of the medical record, a bed exit alarm was initially utilized during plaintiff's October admission. However, on the morning of October 10, a bed exit alarm was no longer charted, despite plaintiff's fall risk remaining the same.

{¶29} Nurse Reid testified that the only patients she has ever known to refuse a bed exit alarm were confused, and the nurses did not deem those patients competent to make that refusal. If a patient does not want a bed exit alarm, a reasonably careful nurse has a long discussion with the patient regarding risks and benefits. She further testified that there was no such discussion of the risks documented in plaintiff's medical record. If a patient still refused a bed alarm after such a discussion, Nurse Reid testified that the nurses could utilize a low bed with mats, move the patient closer to the nurses' station, or utilize a sitter. Nurse Reid opined that a bed exit alarm should have been utilized for plaintiff. She testified that if a bed exit alarm had been placed, it was likely that the alarm would have alerted plaintiff and the nursing staff, and the fall would have been prevented. Nurse Reid also testified that if bed rails had been utilized, they would

have helped to prevent the fall both by providing an extra safety net and by visually reminding plaintiff that she should not get out of bed without assistance. Nurse Reid interpreted Dr. Vong's notes in the medical record to mean that bed alarms and rails were not being utilized at the time of the fall.

{¶30} Nurse Reid disagreed with several opinions expressed by Dr. Ruth Labardee, defendant's expert witness. Nurse Reid chiefly disagreed with Dr. Labardee's opinions regarding the efficacy of bed exit alarms and that there is a lack of medical literature to support the mandatory use of bed alarms in certain situations. She also disagreed with Dr. Labardee's interpretation that the OSUWMC policies did not require a bed exit alarm in plaintiff's situation. Further, Nurse Reid disagreed with Dr. Labardee's opinion that plaintiff did not need a bed exit alarm.

{¶31} During cross-examination, Nurse Reid admitted that since 2005 or 2006 she had not performed duties similar to those performed by either Nurse Huffman or Nurse Molter. She also estimated that approximately ten percent of her patients who fell were utilizing bed exit alarms at the time of the fall. Nurse Reid opined that plaintiff should not have been given the opportunity to refuse a bed exit alarm because a bed alarm was a mandatory precaution. Nurse Reid admitted that she disagreed with the testimony of Dr. Jerome Daniel, plaintiff's medical expert, who opined that plaintiff had the right to refuse the bed exit alarm. Nurse Reid disagreed with Dr. Daniel because plaintiff's medical chart noted that she was forgetful. However, Nurse Reid admitted that the only known instances of plaintiff being forgetful was when plaintiff would walk too fast during physical therapy and that plaintiff may have incorrectly stated that her colostomy bag had been changed.

{¶32} Nurse Reid clarified during cross-examination that the standard of care did not require a low bed. However, in her opinion, the standard of care did require the nurses to move plaintiff to a room closer to the nurses' station after plaintiff had refused a bed exit alarm. Nurse Reid opined that defendant's nurses deviated from the

standard of care because the call light was not within plaintiff's reach. Nurse Reid formed this opinion because plaintiff stated that she could not find the call light and plaintiff's daughter testified that it was frequently over the end of the bed. However, Nurse Reid admitted that it was documented at 4:09 a.m. and at 4:34 a.m. that the call light was within plaintiff's reach.

{¶33} Dr. Jerome Daniel, plaintiff's medical expert, testified via deposition that he is board certified in family practice and that over 50 percent of his patients are over 65 years old. Dr. Daniel practices as part of a family physician group; teaches as an associate professor at the Virginia Commonwealth University, Department of Family Medicine; is the medical director of a hospice; and is on staff at three nursing homes.

{¶34} Dr. Daniel testified that elderly individuals with cognitive issues, such as forgetfulness, were less mindful of their surroundings and more susceptible to falling. Dr. Daniel testified that plaintiff was at a higher fall risk due to being readmitted to the hospital. He later testified that the factors contributing to plaintiff's fall included cognitive difficulty, her history of seizures and fainting spells, general weakness, and visual and hearing issues. Dr. Daniel testified that plaintiff had a seizure about 36 hours before the fall. Dr. Daniel opined that it would have been appropriate for all four side rails to have been raised for plaintiff as a seizure precaution. He opined that if the side rails on plaintiff's bed had been raised, she would not have suffered a fall. Dr. Daniel further testified that plaintiff's confusion may have contributed to her inability to find the call light.

{¶35} Dr. Daniel testified that the healthcare team usually responds within 30 seconds after a bed exit alarm sounds. According to Dr. Daniel, medical staff typically have sufficient time to respond to a bed alarm because most elderly patients move slowly and are still in bed when the caregiver arrives. He later testified that the vast majority of patients who initially refuse a bed exit alarm consent to an alarm after a nurse or doctor explains the risks of falls and injury. Dr. Daniel explained that,

according to his interpretation of the medical record, a bed exit alarm was initially utilized, but then the alarm was removed without explanation. Dr. Daniel opined that the standard of care required a bed exit alarm for plaintiff and that placement of a bed alarm was indicated by OSUWMC's guidelines. Dr. Daniel ultimately opined that a bed exit alarm would have prevented plaintiff's fall both by reminding her not to get up and by alerting medical staff.

{¶36} Dr. Daniel testified that plaintiff suffered fractures of her jawbone and cheekbone as a result of the fall. Plaintiff's injuries affected her ability to use her dentures, making chewing difficult and painful. Dr. Daniel disagreed with Dr. Labardee's opinion that bed alarms are not effective. He also disagreed with her interpretation of OSUWMC policy; he testified that if a patient refuses a bed exit alarm, the nursing staff or a doctor should counsel the patient and family.

{¶37} During cross-examination, Dr. Daniel agreed that it was poor judgment for plaintiff to get out of bed on her own. He further admitted that while four bed rails could have been utilized for plaintiff as a seizure precaution, the standard of care did not require that precaution and the use of three bed rails would have been appropriate. He also admitted that keeping plaintiff in the same room, instead of moving her to a room closer to the nurses' station, was not a deviation from the standard of care. Dr. Daniel testified that the standard of care did not require the use of a low bed.

{¶38} Dr. Ruth Labardee, defendant's nursing expert, testified that she has obtained a Doctor of Nursing Practice degree and she has been the director of nursing quality and evidence-based practice at the Ohio State University (OSU) since February 2018. In a previous position, she was responsible for all nursing policies for OSUWMC. However, she did not participate in writing the nursing guidelines at issue in this case. She is also an adjunct professor at the OSU College of Nursing, in the Doctor of Nursing Practice Program.

{¶39} Dr. Labardee testified that universal fall precautions are implemented for all patients at OSUWMC, regardless of their fall risk. The standard of practice guideline for prevention of patient falls provides that the attending nurse should implement universal fall precautions as well as any appropriate primary fall prevention and protection safety measures for high fall risk and high injury risk patients. (Defendant's Ex. B(h).) Dr. Labardee explained that the term "any appropriate" fall prevention refers to the nurse's duty to assess the patient and involve the patient in decision-making.

{¶40} Dr. Labardee testified that it was appropriate for Nurse Huffman to offer plaintiff a bed exit alarm. Nevertheless, plaintiff had the right to refuse a bed alarm. Dr. Labardee stated that factors in favor of allowing plaintiff to refuse a bed exit alarm included that plaintiff did not need to urinate frequently, she had a colostomy, she had been compliant with the nurses' instructions up until that point, she had not previously tried to get up without help, and plaintiff stated that she did not want a bed alarm. Dr. Labardee testified that Nurse Reid's opinion that a bed exit alarm was mandatory contradicted the guidelines and that placing a bed alarm against the patient's wishes would not be appropriate. However, Dr. Labardee testified that a nurse could mandate a bed exit alarm in an emergency or in situations where the nurse had not had the chance to assess patient compliance.

{¶41} Dr. Labardee testified that OSUWMC's standards and the accreditation standards for the hospital industry both required the use of only three bed rails. Using four bed rails was considered a restraint. Dr. Labardee opined that defendant's nurses and Patient Care Assistant Hanes complied with the standard of care regarding the call light. She testified that the standard of care was to round on the patients every one or two hours, including checks to make sure that the call light was within reach. The evidence showed that Nurse Molter and Patient Care Assistant Hanes complied with the standard of care by appropriately checking on plaintiff and ensuring that the call light was within reach.

{¶42}  Ultimately, Dr. Labardee opined that the OSUWMC medical staff complied with the standard of care in treating and caring for plaintiff.  Dr. Labardee admitted that the refusal of the bed exit alarm should have been noted in the medical record, but she stated that it was nearly impossible to chart every discussion with a patient.  Even if a bed exit alarm had been utilized, based on the location of the room in the hospital, Dr. Labardee opined that a bed exit alarm would not have prevented plaintiff's fall.  During cross-examination, Dr. Labardee testified that she believed that the nursing note in the flow sheets showed that, on the day plaintiff was admitted, the alarms were activated and audible.

{¶43}  Upon review of the evidence presented at trial, the court concludes that the treatment provided by OSUWMC medical staff complied with the relevant standard of care at all times.  Regarding the position of the bed rails, although plaintiff contends in her post-trial brief that "no side rails [were] up" at the time in question, the testimony of both plaintiff and Clipper was not consistent regarding this issue.  Plaintiff specifically testified that the rails on the right side of the bed were down.  Although Clipper testified that the bed rails were down when she visited her mother the day before the fall, both plaintiff and Clipper testified that, until recently, they thought that there was only one bed rail on each side of the bed, instead of two.  After Clipper was asked during cross-examination if she was certain that all four of the rails were down, she admitted that she could not remember; she recalled only that the two rails on the right were down.  Although Clipper testified that a "charge nurse" informed her that the bed rails were down at the time of the fall, she was not able to reliably identify or describe that nurse.

{¶44}  In contrast, all three of the OSUWMC employees who attended to plaintiff, Nurse Huffman, Nurse Molter, and Patient Care Assistant Hanes, testified that three bed rails were raised at all times.  Although Nurse Reid interpreted Dr. Vong's note to indicate that bed rails and a bed exit alarm were not being used at the time of the fall, Dr. Vong credibly testified that her note reflected the position of the bed rails when she

first entered the room after the fall, not the arrangement of the bed when plaintiff fell. The court concludes that three bed rails were in the raised position during the time of plaintiff's fall and that the position of the bed rails complied with the standard of care. Although plaintiff argues that all four bed rails should have been raised due to plaintiff's history of seizures, none of the expert witnesses testified that the standard of care required that configuration.

{¶45} Regarding whether plaintiff's call light was within her reach at the time of the fall, although plaintiff testified that she did not see the call light before she got out of bed, the evidence shows that the call light was within reach during the rounding checks performed at 4:09 a.m. and 4:34 a.m. Additionally, the nurses consistently testified that it was their standard practice to wrap the call light cord around a bed rail so that it stayed in place. The court finds that the preponderance of the evidence shows that the call light was within plaintiff's reach.

{¶46} Although Nurse Huffman did not document plaintiff's refusal of the bed alarm in the medical record, the court finds that she credibly testified that she offered plaintiff a bed exit alarm and that both plaintiff and Clipper declined the alarm. The court finds that Clipper's credibility was diminished by her inaccurate memory of the position of the bed rails. Although Nurse Reid testified that a bed exit alarm was mandatory, her explanation as to why plaintiff should not have had the right to refuse the alarm was not persuasive. Indeed plaintiff's medical expert, Dr. Daniel, contradicted her on this point. In contrast, defendant's expert witness provided a convincing explanation regarding the standard of care, and a patient's right to decline a bed alarm. The court is persuaded by the testimony that plaintiff had the right to refuse a bed exit alarm.

{¶47} Regardless of whether a bed exit alarm was offered, the court finds that plaintiff failed to prove that a bed exit alarm would have prevented her from falling. Although plaintiff contends that she was confused, forgetful, or otherwise had an

impaired cognitive status when she exited the bed, she admitted that she made a conscious decision to get out of bed. Plaintiff also admitted during cross-examination that she wanted to get up to show people that she could walk. Furthermore, plaintiff failed to prove that medical staff could have reached her in time to prevent the fall if a bed exit alarm had sounded. Neither of plaintiff's experts knew the layout of the hospital wing or the location of the medical staff on the floor at the time of the fall, and plaintiff testified that she fell after only two steps. Plaintiff failed to prove by a preponderance of the evidence that a bed exit alarm would have prevented her from falling.

{¶48} Finally, plaintiff did not prove that the standard of care required the use of alternative safety measures after plaintiff declined the bed exit alarm, such as a low bed, a sitter, or transferring her to a different room. None of the experts opined that the standard of care required the use of a sitter or a low bed. Nurse Reid's opinion that the standard of care required moving plaintiff to another room was contradicted by both Dr. Daniel and Dr. Labardee and there was no evidence to show that another room was available. Consequently, the court is not persuaded that plaintiff should have been transferred to a room that was closer to the nurses' station.

{¶49} Ultimately, the court finds that plaintiff voluntarily and with a clear mind chose to exit her hospital bed. The court concludes that the treatment provided by OSUWMC medical staff complied with the relevant standard of care at all times.

{¶50} For the foregoing reasons, the court finds that plaintiff failed to prove that OSUWMC staff was negligent in their care of plaintiff. As a result, both plaintiff's medical negligence and ordinary negligence claims fail. Accordingly, judgment is recommended in favor of OSUWMC.

{¶51} *Note: the following requirements for filing objections have been tolled by the March 27, 2020 Order of Chief Justice of the Supreme Court of Ohio and the Governor's declaration of a public health emergency until July 30, 2020 or the end of*

the emergency, whichever is sooner. See 03/27/2020 Administrative Actions, 2020-Ohio-1166.

{¶52} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

ANDERSON RENICK
Magistrate

**Filed May 4, 2020**
**Sent to S.C. Reporter 6/26/20**